UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                          Criminal No. 23-MJ-1491-DLC

CAROLINA CORREA,
              Defendant

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David J. Spirito, a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA"), being duly sworn under oath, state as follows:

### Agent Background

1.      I am employed by the Newton Police Department, where I have worked since 2000. I am currently assigned to the Detective Bureau.  Since 2011, I have been assigned to the Boston Office of the New England Division of the DEA as a Task Force Officer ("TFO").  I am currently assigned to the Organized Crime Drug Enforcement Task Force Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.  I am a graduate of the Massachusetts Criminal Justice Training Council ("MCJTC") Police Academy (1st Municipal Police Officers Class, Weymouth, Massachusetts).

2.      As a DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the Police

Academy.  I also have attended additional specialized training courses in furtherance of my past and current assignments.

3.      I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations.

4.      I have participated in all aspects of drug, organized crime, and gang investigations, including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of phones.  I have received extensive specialized training in the fields of gangs, organized crime, and controlled substance identification, investigation, and enforcement.  I have also received training related to the methods used by narcotics traffickers to conceal and launder proceeds of their narcotics-trafficking activities.

5.      As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the import, transport, storage, distribution, and trafficking of narcotics and the methods of payment for such drugs, as well as the manner and means in which drug traffickers commonly launder their drug proceeds.  Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, state, national, and international levels, including those involving the distribution, storage, and

transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  I understand that illegal drug trafficking often involves the local, interstate, and international movement of drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants, including suppliers, customers, distributors, and money launderers.

### Purpose of the Affidavit

6.      I submit this affidavit in support of a criminal complaint against Carolina Correa ("CORREA"), charging that beginning at least in or about February 2021 and continuing through at least in or about February 2022, CORREA knowingly and intentionally conspired with others to commit money laundering and other acts prohibited by 18 U.S.C. §§ 1956 and 1957, in violation of 18 U.S.C. § 1956(h).

7.      The object of the money laundering conspiracy in violation of 18 U.S.C. § 1956(h) was (a) to conduct or attempt to conduct a financial transaction involving the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, as prohibited by 18 U.S.C. § 1956(a)(1)(B), and (b) to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity, as prohibited by 18 U.S.C. § 1957(a).

8.      This affidavit does not set forth all the facts developed during the course of this investigation.  Nor does it set forth all information known to me and other investigators about this matter.  Rather, it sets forth only those facts that are necessary and sufficient to establish the requisite probable cause to believe that CORREA engaged in a conspiracy in violation of 18 U.S.C. § 1956(h).

**Relevant Statutes**

9.      18 U.S.C. § 1956(a)(1) states: "Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity … shall be [punished.]"

10.     18 U.S.C. § 1957(a) states: "Whoever … knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished[.]"

11.     18 U.S.C. § 1956(h) states: "Any person who conspires to commit any offense defined in [section 1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

**Probable Cause**

***Background Regarding the Drug and Money Laundering Investigation***

12.     Since at least September 2019, law enforcement agents from the DEA, the Internal Revenue Service, the FBI, and partner agencies have been investigating Jasdrual a/k/a Josh Perez ("PEREZ"), the leader of a drug trafficking organization (the "PEREZ DTO") based in Providence, Rhode Island.  PEREZ is a Rhode Island-based nightclub owner and drug trafficker with suspected ties to Mexico and Colombia.  The investigation revealed that the PEREZ DTO was involved in the distribution of fentanyl, heroin, and cocaine in Massachusetts, Rhode Island, New York, and elsewhere.  The proceeds from these drug trafficking activities were then laundered through a

variety of methods, including through the money laundering conspiracy described below and joined by CORREA.

13.     On February 11, 2022, federal law enforcement officers arrested PEREZ and charged him via Criminal Complaint in the District of Massachusetts for conspiracy to distribute over 400 grams of a mixture or substance containing fentanyl, in violation of 21 U.S.C. § 846.  *See United States v. Jasdrual Perez et al.*, 22-cr-10059-LTS (D. Mass.).  On March 16, 2022, a federal grand jury returned an indictment charging PEREZ and another individual associated with the PEREZ DTO for the same offense, alleging a conspiracy that lasted from at least February 2021 through February 2022.  *Id.* at ECF 23.  On July 28, 2022, a federal grand jury returned a superseding indictment charging PEREZ and two others associated with the PEREZ DTO for the same offense.  *Id.* at ECF 61.  The charges against PEREZ are still pending.

14.     During the relevant 2021 and 2022 period charged in the PEREZ drug trafficking conspiracy, CORREA was the girlfriend of PEREZ and resided with PEREZ at his then-residence of 141 Alpine Estates Drive in Cranston, Rhode Island.

### *Certain Relevant Investigative Steps*

15.     The multi-year, multi-agency investigation into the PEREZ DTO involved law enforcement obtaining judicial authorization to intercept phones used by members of the PEREZ DTO, obtaining judicial authorization to intercept oral communications in and around a vehicle driven by PEREZ, obtaining judicial authorization to install closed circuit television ("CCTV") in and around the PEREZ vehicle, obtaining judicial authorization to track location information of vehicles and phones used by members of the PEREZ DTO, obtaining information from confidential sources and cooperating witnesses, obtaining information from other law enforcement agencies, obtaining search warrants for residential locations and vehicles associated with the

PEREZ DTO, conducting physical and electronic surveillance, analyzing toll and financial records, and making drug seizures and arrests. Through these various investigative means, investigators obtained evidence related to CORREA's involvement in a money laundering conspiracy with PEREZ and others. Some of these investigative steps are detailed below.

16.     On November 30, 2021, United States District Judge Denise J. Casper, District of Massachusetts, issued an order authorizing the interception of wire and electronic communications to and from a phone ending in x5328 believed to be used by PEREZ (the "Perez Phone"). 21-MC-91332-DJC (D. Mass.) (under seal).

17.     In addition to using his cell phone, PEREZ used his Dodge Ram truck (the "Perez Truck") as a secure location from and within which to communicate with others regarding drug trafficking and money laundering activities. PEREZ communicated about these activities in person, over the phone, and over encrypted phone applications (including FaceTime and WhatsApp) while in the Perez Truck.

18.     On January 11, 2022, United States District Judge Denise J. Casper, District of Massachusetts, authorized the renewed interception of wire communications to and from the Perez Phone, as well as the initial interception of oral communications in and around the Perez Truck. 21-MC-91332-DJC (D. Mass.) (under seal).   In addition, investigators obtained judicial authorization to obtain video (CCTV) from inside the Perez Truck. As further described below, investigators intercepted communications between PEREZ and CORREA both over the Perez Phone and while inside the Perez Truck, which showed the close personal relationship between PEREZ and CORREA. These communications included, among other things, discussions related to CORREA's knowing participation in a money laundering conspiracy.

19.     Prior to his February 2022 arrest, PEREZ resided at 141 Alpine Estates Drive in Cranston, Rhode Island.   CORREA resided with PEREZ at this address.   In addition, PEREZ owned a property at 21 Imera Avenue in Providence, Rhode Island, which investigators determined to be a stash house used by the PEREZ DTO.   On February 4, 2022, United States Magistrate Judge Patricia A. Sullivan, District of Rhode Island, authorized warrants to search and seize evidence from 141 Alpine Estates Drive in Cranston, Rhode Island and 21 Imera Avenue in Providence, Rhode Island. 22-SW-12-PAS (D.R.I.) (under seal).

20.     On February 7, 2022, at approximately 7:26 a.m., investigators executed the search warrant at 21 Imera Avenue, Providence, Rhode Island. During the search, investigators seized a sophisticated marijuana grow from the detached garage.  Inside the house, from an unfinished and locked room off the kitchen, investigators seized two pill presses, gallon-sized freezer bags and other large plastic bags of counterfeit prescription pills containing fentanyl, as well as powder and other materials used in manufacturing pills, including kilograms of pill binder. From a bedroom, agents seized additional pills containing fentanyl.   Investigators estimate that at least 50,000 pressed pills containing fentanyl were seized from 21 Imera Avenue. The pills and loose powder seized from 21 Imera Avenue were submitted to the DEA Northeast Laboratory for testing and analysis.  Although some results are still pending, testing confirmed that they contained fentanyl. The approximate total weight of the fentanyl pills and loose fentanyl powder seized that day exceeded 14 kilograms.

21.     Based on intercepted communications, particularly those in and around the Perez Truck, investigators believe that PEREZ learned about the warrant executed at 21 Imera Avenue at approximately 11:15 a.m. During an intercepted communication between CORREA and PEREZ, PEREZ told CORREA he was "screwed." In summary, PEREZ told CORREA that the

police came, that he needed to hide, that he thought he was being followed, and that CORREA needed to take "la cartera" (which means "wallet" in Spanish) and leave.  Shortly thereafter, investigators at 141 Alpine Estates Drive observed CORREA drive away from that address and drive directly to 47 Morgan Avenue in Johnston, Rhode Island (the residence of PEREZ's sister).  After learning about the search warrant executed at 21 Imera Avenue, PEREZ drove from Providence, Rhode Island to New York City, New York.  Investigators believe he did so in an effort to evade law enforcement after the execution of the search warrants.

22.     Later on February 7, 2022, investigators executed a search warrant at PEREZ and CORREA's 141 Alpine Estates Drive home, where they recovered multiple cellular devices and approximately $62,153 dollars in U.S. currency, which investigators believe were drug proceeds.

23.     On February 7, 2022, agents briefly spoke with CORREA.  CORREA asked me why PEREZ was being investigated and I informed her that it was for narcotics-related violations.  CORREA stated that she was aware that PEREZ was involved with marijuana but claimed that she was not concerned about that due to the legalization of marijuana.  I informed her that although individual states had legalized marijuana, marijuana had not been legalized by the federal government.  I further informed her that PEREZ was being investigated for trafficking fentanyl.  CORREA stated that she could not believe that PEREZ was involved with fentanyl and stated, "I work with organizations that are against drug use, I cannot believe that."   She further stated, "I've been with this man for over a year, I sleep next to him, I can't believe he would be involved with fentanyl."

24.     Based on my familiarity with the investigation, I believe CORREA's statements on February 7, 2022 were self-serving and inconsistent with the facts uncovered during the investigation into the PEREZ DTO.  As described below, CORREA and PEREZ conspired to launder hundreds of

thousands of dollars in the month leading up to the execution of the warrants on February 7, 2022. The facts and circumstances of that money laundering conspiracy, including conversations summarized below where CORREA was recorded talking about efforts to "wash" money and efforts to get "clean money" are inconsistent with a claim that CORREA believed PEREZ was only involved in lawful activity.

25.     I believe that CORREA was aware of PEREZ's unlawful activities and helped him launder the criminally derived proceeds because she was his live-in girlfriend during the relevant period charged in PEREZ's indictment.  For example, on February 2, 2022 (*i.e.*, days before PEREZ was arrested and before the search warrants were executed on PEREZ's properties), agents intercepted a call between PEREZ and CORREA while PEREZ was at 21 Imera Avenue in Providence, Rhode Island.  On that call, CORREA asked PEREZ if she should come pick him up, to which PEREZ responded, "you're not picking me up, come get the keys" and "while I finish what I'm doing.  Feel me?"  Based on my training, experience, and familiarity with this investigation, I believe PEREZ told CORREA not to come pick him up because he was pressing fentanyl pills.  During this conversation, metallic sounds can be heard in the background.  Based on my training and experience, I believe those sounds are consistent with a pill press being operated to manufacture fentanyl pills.  A few seconds later, during the intercepted call with CORREA, PEREZ is overheard saying to another individual at 21 Imera Avenue, "go do the thousands." I believe PEREZ asked the other individual to put the pressed fentanyl pills in bags of one thousand pills per bag.  Five days later, when executing a search warrant at this address, agents seized two pill presses, approximately over 50,000 pressed pills containing fentanyl and additional kilograms of fentanyl powder, and numerous other items involved in the manufacturing and packaging of fentanyl pills.

### *Additional Information on Carolina Correa and Her Financial Dealings*

26.     CORREA works at the Rhode Island chapter of a major international nonprofit charitable fundraising organization ("Charitable Organization"), where she serves as Program Officer, Donor Relations.  CORREA's known sources of income include payroll deposits from the Charitable Organization, totaling between $40,000 and $50,000 annually, from 2019 through 2022.

27.     A financial investigation into CORREA has revealed a number of unusual or suspicious transactions.  CORREA maintained personal bank accounts with Santander Bank, TD Bank, and Citizens Bank.  CORREA's Santander account was primarily utilized to receive her payroll deposits from the Charitable Organization, which she then transferred into her Citizens checking account.  In addition to these transfers, during the 4-plus year period between 2019 and February 2023, CORREA made cash deposits into her Citizens checking account totaling approximately $141,650, along with more than $100,000 in peer-to-peer transfers via Cash App, Venmo, and Zelle.

28.     CORREA is the registered agent for a business called BOUNTY TRUCKING LLC, with a listed business address of 141 Alpine Estates Drive, Cranston, Rhode Island, which was incorporated in Rhode Island in October 2020.  The business had its status revoked by the Rhode Island Secretary of State in December 2021 for failure to file an annual report, was subsequently reinstated, and was revoked again in 2023.  Prior to his February 2022 arrest, PEREZ and CORREA resided at the Alpine Estates address listed as the business address for BOUNTY TRUCKING LLC. As stated above, the February 7, 2022 search warrant executed at this address resulted in the seizure of approximately $62,153 believed to be drug proceeds.

### *Background on the Marijuana Dispensary and Individual 1*

29.     As further detailed below, the investigation has revealed that prior to PEREZ's arrest in February 2022, PEREZ and CORREA agreed to launder at least $350,000 in proceeds

from unlawful activity, and they did so through financial transactions tied to a marijuana dispensary business in Massachusetts (the "Marijuana Dispensary"). The Marijuana Dispensary is owned and operated by a friend and associate of PEREZ and CORREA ("Individual 1").

30.     Based on information available from the Secretary of the Commonwealth of Massachusetts, the Marijuana Dispensary is a business incorporated in Massachusetts on August 21, 2020.  Individual 1 is listed as the initial registered agent, the president, and the director of the Marijuana Business on the company's Articles of Organization, as viewed on the Massachusetts Corporations Division website.

31.     The Massachusetts Cannabis Control Commission ("CCC") issued provisional licenses to the Marijuana Business to operate a marijuana dispensary in a town in Worcester County, Massachusetts.  These licenses were for cultivation (up to 5,000 square feet), product manufacturing, and retail.  In the application submitted to the CCC, Individual 1 was listed as maintaining 70% ownership and control and Individual 2 was listed as having the remaining 30% ownership and control.   Individual 2 was listed as the individual contributing the initial capital for the business in the amount of $450,000.  The CCC awarded the Marijuana Dispensary business a priority status, which makes the business an expedited applicant, because the business was submitted as a Woman-Owned Business.   Individuals 1 and 2 are both women and their identities are known to me.

*Perez's Interest in the Marijuana Dispensary*

34.     The investigation into PEREZ and CORREA has revealed their interest in investing money in the Marijuana Dispensary, which the investigative team believes was a conduit for PEREZ and CORREA to launder proceeds from the unlawful activities of the PEREZ DTO.

35.     Through intercepted communications, documentary evidence, a review of bank records, and witness interviews, investigators learned that in the second half of 2021, PEREZ and CORREA expressed an interest in investing funds in the Marijuana Dispensary.

36.     Further investigation revealed that Individual 1 is a longtime social contact of PEREZ and CORREA.  In approximately the fourth quarter of 2021, the Marijuana Dispensary was in urgent need of cash for continued operating expenses.  Given the cash needs of the business, Individual 1 sought funding from outside investors.  Around this time, Individual 1 discussed with CORREA and PEREZ whether PEREZ could provide the funding needed by the Marijuana Dispensary.  On multiple occasions, Individual 1 discussed with CORREA whether CORREA and/or PEREZ could provide the Marijuana Dispensary with the funding needed by the company for its operational expenses.  At the same time, Individual 1 also had discussions with other potential sources of funding.

### Correa's Interest in Laundering Drug Proceeds

37.     Intercepted communications between CORREA and PEREZ during the latter part of 2021 confirm that CORREA had a significant interest in trying to help PEREZ find ways to invest money—money that CORREA had reason to believe was criminally derived funds. [1]

38.     For example, on December 28, 2021, at approximately 12:19 p.m., agents intercepted a call between PEREZ and CORREA during which CORREA discussed with PEREZ the possibility of investing money in the Marijuana Dispensary. CORREA told PEREZ about her

---

[1] Interceptions of the communications discussed in this affidavit are based on my training and experience, the training and experience of other investigators, my involvement in this investigation, and in some cases, subsequent events. Additionally, the interpretations herein are based upon real-time summaries of interceptions of communications and are agents' interpretations of these calls in real-time.  All times set forth herein are approximate.  Quotations from intercepted conversations cited in this affidavit are derived from preliminary draft transcripts and/or synopses ("line sheets") of conversations that occurred, many primarily in Spanish. The line sheets are subject to revision upon finalization.

conversations with Individual 1 regarding this possible investment.  CORREA and PEREZ discussed what equity they would get in the Marijuana Dispensary if they put money into that business. CORREA and PEREZ also discussed how Individual 1 accepting funding from another source would impact PEREZ and CORREA's ability to invest in the business or their ownership stake ("They wanna pretty much wipe us out" and "So they're like, 'Alright so if we don't take them out of the picture cause we technically wouldn't need them.'").  CORREA also told PEREZ that she tried to convince Individual 1 not to accept money from another source, suggesting that CORREA may be able to get Individual 1 a quarter million dollars ( "[I] told her, I was like 'What about if I get you a quarter mil by January, would you guys be able to hold and just not deal with other people' and I think that's our best bet, cause their hands are pretty much tight Jas").

39.    As another example, on January 17, 2022, beginning at approximately 1:02 p.m., investigators intercepted communications between CORREA and PEREZ during which CORREA and PEREZ discussed investing money, and whether PEREZ should prioritize putting money in real estate or in the Marijuana Dispensary.  As part of that conversation, CORREA advised PEREZ to prioritize the Marijuana Dispensary.  In relevant part:

PEREZ          What strategy should I use?

CORREA        I think you should [voices overlap]

PEREZ          I gonna hard with the dispensary first, right now [voices overlap]

CORREA        Yeah with the dispensary should be the first…

40.    Later in the January 17, 2022 intercepted communication, CORREA advised PEREZ that after he invests in the Marijuana Dispensary, PEREZ should take the proceeds from the dispensary to buy rental properties and flip them.  CORREA described these steps as the "strategy" that PEREZ—a drug dealer and her boyfriend—should pursue to get "clean money":

| CORREA | I think…priority, I think it should be the dispensary. |
| PEREZ | Yeah and I'm going to mention [voices overlap] … |
| CORREA | Priority |
| PEREZ | Uh-hm |
| CORREA | And then anything that you could get from that, what I would do if I was you, your first properties, like, I would get rental property in Pennsylvania. And then I would do a flip, because your flip is what's gonna give you clean money. That should be your strategy. |

Based upon this conversation and others between CORREA and PEREZ, I believe that CORREA knew that PEREZ's money was criminally derived.  Based on my training, experience, and familiarity with this investigation, I believe that CORREA conspired with PEREZ to conceal the nature and source of his money, and to do so, told PEREZ that he needed to purchase and then sell property in another state ("I would get rental property in Pennsylvania. And then I would do a flip"). I also believe that CORREA knew that a purchase of real estate with criminally derived funds and a subsequent sale of the same property would conceal the source of the proceeds ("your flip is what's gonna give you clean money.").

### *Individual 1's Rejection of Funding from Perez and Correa's Involvement as Fundraiser*

41.     The investigation revealed that at some point in either the fourth quarter of 2021 or the first quarter of 2022, Individual 1 informed CORREA and PEREZ that Individual 1 could not (or would not) accept a cash investment directly from PEREZ.  Although I believe that Individual 1 decided not to accept funding directly from PEREZ, Individual 1 was separately aware that CORREA worked as a professional fundraiser for the Charitable Organization.  Individual 1 accordingly discussed with CORREA whether she could help the Marijuana Dispensary raise funding by reaching out to her fundraising contacts.  Individual 1 reported that she initially agreed to pay CORREA a finder's fee to help secure funding for the Marijuana Dispensary.  Individual 1

stated that she later agreed to give CORREA an ownership stake in the Marijuana Dispensary if CORREA could help raise the much-needed operating funds, and Individual 1 agreed to further consider CORREA as the Chief Financial Officer of the Marijuana Dispensary.

42.     At some point in approximately January 2022, CORREA informed Individual 1 that CORREA had helped secure funding for the Marijuana Dispensary in the amount of $350,000 from two "friends" of CORREA's who owned two separate real estate businesses in North Carolina for the sum of $350,000.  I am aware of the names of these funding sources in North Carolina.  For present purposes, they are referenced herein as (a) Funding Company 1 owned by Funding Person 1, which purportedly agreed to provide $100,000 at a three percent interest rate if paid in full in one year, and a fifteen percent interest penalty if paid after one year; and (b) Funding Company 2 owned by Funding Person 2, which purportedly agreed to provide $250,000 under the same terms and conditions.

43.     Based on my familiarity with the investigation coupled with the facts and circumstances of these transactions, I believe that the $350,000 provided by Funding Company 1 and Funding Company 2 to the Marijuana Dispensary do not appear to be legitimate, arms-length corporate transactions.  Instead, I believe that CORREA and PEREZ used Funding Company 1 and Funding Company 2 to conceal or disguise the true nature, source, ownership, or control of the proceeds of unlawful activity that CORREA and PEREZ were funneling through these entities and using to fund the Marijuana Dispensary, and CORREA and PEREZ knowingly conspired to engage in monetary transactions of a value greater than $10,000 in criminally derived property, all in violation of the money laundering statutes outlined in 18 U.S.C. § 1956 and 1957.

*The Concealment of Funds Through the North Carolina Funding Companies*

44.     Based on my familiarity with the investigation and as detailed below, I believe that CORREA and PEREZ agreed to conceal their criminally derived funds through the Marijuana Dispensary. I further believe that to do so, CORREA and PEREZ agreed with another (hereinafter, "Co-Conspirator 1") to have Co-Conspirator 1 drive a rental car on PEREZ and CORREA's behalf down to North Carolina with approximately $350,000 in criminally derived funds. I further believe that once Co-Conspirator 1 arrived in North Carolina, Co-Conspirator 1 provided the $350,000 in cash to individual(s) associated with Funding Companies 1 and 2, and Funding Companies 1 and 2 then wired this money to entities associated with the Marijuana Dispensary.

45.     On January 19, 2022, at approximately 5:36 p.m., investigators intercepted a communication between PEREZ and CORREA during which they discussed the rental of a vehicle from Richmond Motor Sales of Providence, Rhode Island.   As detailed below, I believe that CORREA assisted with the rental of that vehicle, which I believe was used by Co-Conspirator 1 to drive the drug proceeds down to North Carolina. In relevant part:

| | |
|---|---|
| CORREA: | I was going to ask you where I can rent a car, love. Do you know who is the owner of Richmond Motor Sales and Rental? |
| PEREZ: | Oh, my uncle's best friend. |
| CORREA: | Because that's where we are going to rent the thing and they only, they only use cash. |
| PEREZ: | Okay. |
| CORREA: | That's a cash business, I mean, they only rent cars with cash. |
| PEREZ: | Better yet. |
| CORREA: | Better yet, so we are going to rent the car there on Friday… |

46.     On January 21, 2022, at approximately 5:54 p.m., investigators intercepted a communication between PEREZ and Richmond Motor Sales during which the owner of the car rental business indicated that a rental vehicle will be ready to be picked up the following morning, that is, January 22, 2022.

47.     On January 22, 2022, at approximately 7:15 p.m., investigators intercepted a conversation between CORREA and PEREZ discussing the arrival of Co-Conspirator 1 at her destination in North Carolina and the counting of the cash proceeds transported to North Carolina at their direction.  In relevant part:

CORREA:     Uh... So [Co-Conspirator 1] just got there and they finished counting the money; but there was 200 dollars missing so I just told her to put it from like her money.

PEREZ:      Carolina you see what you... Oh my God... alright Carolina talk to you later...

CORREA:     I mean... what do you mean?

PEREZ:      Like you don't make sense sometimes. Look what you saying right now.

CORREA:     I didn't want to do it... I didn't want to text it.

PEREZ:      Carolina, we will talk soon. No problem.

Based on my training, experience, and familiarity with the investigation, I believe that CORREA told PEREZ that Co-Conspirator 1 arrived in North Carolina with the drug proceeds ("So [Co-Conspirator 1] just got there and they finished counting the money"), that there were concerns that $200 was missing ("but there was 200 dollars missing"), and CORREA advised Co-Conspirator 1 to use her own money to replace it ("so I just told her to put it from like her money"). I further believe that in response, PEREZ was frustrated with CORREA for discussing the money laundering so openly on the phone, which could lead to trouble if law enforcement was monitoring the communication ("Carolina, you see what you…Oh my god…alright Carolina talk to you

17

later…"). When CORREA realized PEREZ's frustration, I believe that CORREA indicated that she did not want to memorialize it over text ("I didn't want to do it…I didn't want to text it").

48.     On January 22, 2022, at approximately 11:22 p.m., investigators intercepted a communication between PEREZ and CORREA during which they discussed the return of Co-Conspirator 1 from North Carolina:

CORREA:     When you get back, don't block her [Co-Conspirator 1's] car.

PEREZ:       Okay

CORREA:     Are you going to work today?

PEREZ:       I'm already here.

CORREA:     Alright, don't block her car cause she's driving…she, it took twelve hours to get there.

PEREZ:       Holy shit.

CORREA:     And she's driving straight back, so she just called so don't block her car.

PEREZ:       Okay, and they already did that for you?

COREA:       Yeah.

49.     Shortly after this communication, on January 23, 2022, a Rhode Island State Police Detective drove by 141 Alpine Estates Drive in Cranston and observed a Honda sedan bearing State of Virginia registration xxx1840[2] parked in the driveway of the residence. A query of that vehicle yielded the registered owner as PV Holding Corporation. Investigators learned that the vehicle was rented on January 21, 2022, at approximately 6:58 p.m. at the TF Green Airport in Warwick, Rhode Island by PEREZ.  As contact information at the time of the rental, PEREZ provided his driver's license, the address of 21 Imera Avenue in Providence, Rhode Island, and

---

[2] The full registration number is known to law enforcement.

the Perez Phone ending in x5328. The vehicle was returned on January 23, 2022 at around 4:10 p.m. The return of service also identified Co-Conspirator 1 as an additional driver on the vehicle. The odometer reading on the vehicle showed 16,865 miles at the time of the rental and 18,678 miles upon return. I believe the number of miles driven by the rental car is consistent with it traveling to and from North Carolina.

50.     On January 23, 2022, at approximately 3:37 p.m., investigators intercepted another conversation between CORREA and PEREZ discussing the transportation of approximately $352,500 to North Carolina by Co-Conspirator 1. In relevant part:

CORREA:     [UI] told me, "Don't you ever ever…like…don't ever do that. "Like I hope you're not the one bringing it". I said "of course not"…

PEREZ:     We're not bringing it my n***a, we sent that n***a…. she can get robbed. She had $400,000 on her.

CORREA:     Yeah, yeah.

PEREZ:     (Chuckles) Fuck, what the fuck that n***a got to say. And [Co-Conspirator 1] is a troop…

CORREA:     Yo, thirty hours straight! I don't know how she did that.
…
CORREA:     She might [U/I] at you like [U/I]. I just feel bad for her, because the guy was supposed to go and meet her in North Carolina at my boy's house. But he needed to be back by 5:00 for his daughter's birthday. So, she then had to….literally, we were waiting for you, had to wait for you like an hour. The she had to drive all the way to your mom's house. Like… she wasn't gonna make it on time. Then she had to drive another five hours to South Carolina.

PEREZ:     Yeah, I don't know why the fuck I missed the fifty. My mom… [U/I] you.

CORREA:     Thank God, thank God, cause she's like, nah! "He said he counted it and it's all good". And I was like, "are you sure"?

PEREZ:     Yeah, 350. That's why I told you 2500. It's supposed to be 352-500 (352,500). When you told me the extra 50G I'm like "what the fuck you talking about"?

CORREA:     It was a whole 50 and I would have sent [voices overlap].

PEREZ:     Like I am [U/I]

19

CORREA:      I would have just sent it and we would have just washed less.

Based on my training, experience, and familiarity with the investigation, I believe that PEREZ and

CORREA discussed Co-Conspirator 1 successfully transporting $350,000 of drug proceeds to the

residence of an unknown party ("my boy's house") to be laundered for the purpose of reinvesting.

I further believe that there was an additional $2,500 included in the money given to Co-Conspirator

1, which was to serve as payment to Co-Conspirator 1 for transporting the drug proceeds on behalf

of CORREA and PEREZ.  I also believe that CORREA had intended to launder $400,000, and

that PEREZ was not aware of, or did not locate, the extra $50,000 from the residence of his mother,

Judith Perez ("Yeah, I don't know why the fuck I missed the fifty. My mom…"). I further believe

that CORREA told PEREZ that if the amount was less, they would have just "washed" or

laundered less dirty money ("I would have just sent it and we would have just 'washed less'").

51.     Later in the January 23, 2022 conversation, PEREZ and CORREA discussed

whether CORREA was at risk of being "burned" by her North Carolina contact because CORREA

had already handed over hundreds of thousands of dollars in cash and they now needed to wait for

Funding Company 1 and Funding Company 2 in North Carolina to send wire transfers to the

Marijuana Dispensary to make it appear as if the money was coming from them:

PEREZ:        …So, they both did the wire transfer already?

CORREA:      Babe, the wire transfer has to be done at the bank. But there's no bank open.

PEREZ:        But you already gave him the fucking money. What if they burn you Carolina?

CORREA:      With the promissory note, the promissory note. They're not going to burn us, babe. If they were gonna burn us you think he would have taken us to his home? And let [Co-Conspirator 1] take a rest and shower in his fuckin bathroom? Giving us their address, giving us all their information?

PEREZ:        You'd be surprised kid….

20

At a different point in the conversation, CORREA and PEREZ make clear that this whole concealment and money laundering scheme is part of their efforts to invest in the Marijuana Dispensary:

> PEREZ:     So, we're basically, the dispensary is gonna happen, we're basically almost there.
>
> CORREA:    I'll be happy when the money comes in.

52.     Banking and financial records show that the very same week that Co-Conspirator 1 transported $350,000 in drug proceeds to North Carolina on behalf of CORREA and PEREZ, a total of $350,000 in funds from Funding Company 1 and Funding Company 2 in North Carolina was wired to an IOLTA bank account held by the attorney representing Individual 1 and the Marijuana Dispensary in this financing transaction ("Marijuana Dispensary IOLTA Account."). Specifically, on January 25, 2022, the Marijuana Dispensary IOLTA Account received a $250,000 wire transfer from a business account for Funding Company 2 in the name of Funding Person 2. The next day, on January 26, 2022, the Marijuana Dispensary IOLTA Account received a $100,000 wire transfer from a business account for Funding Company 1 held in the name of Funding Person 1.  Following the receipt of $350,000 from Funding Company 1/Funding Person 1 and Funding Company 2/Funding Person 2, on February 3, 2022, the attorney for the Marijuana Dispensary made a $350,000 outgoing wire payment to a contractor for the Marijuana Dispensary, noting in the wire instructions that the payment was on behalf of Individual 1.

53.     Based on the financial transactions analyzed above, coupled with other information from this investigation, I believe that the $350,000 transferred from the North Carolina funding companies to the Marijuana Dispensary IOLTA Account were cash proceeds of PEREZ's unlawful activities that CORREA helped PEREZ conceal.  I further believe that PEREZ and CORREA enlisted Co-Conspirator 1 to transport the proceeds of PEREZ's unlawful activities to North

Carolina so that the two North Carolina funding companies would transfer this $350,000 to the Marijuana Dispensary, and the funding companies actually did transfer $350,000 to an account associated with the Marijuana Dispensary within the same week that CORREA and PEREZ conspired to have Co-Conspirator 1 drive $350,000 in cash down to North Carolina.

## Conclusion

Based on the information set forth above, CORREA agreed with PEREZ to conceal or disguise the nature, source, ownership, or control of his unlawful activities. CORREA also agreed with PEREZ to launder proceeds by diverting funds to the Marijuana Dispensary through third parties. Accordingly, probable cause exists to believe that CORREA conspired to commit money laundering, in violation of 18 U.S.C. § 1956(h), specifically, a conspiracy to violate § 1956(a)(1) and § 1957(a).

I, David J. Spirito, state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ David J. Spirito

David J. Spirito
Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 on October 31, 2023.

Hon. M. Page Kelley
United States Magistrate Judge
District of Massachusetts

22